**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **GEORGE L. PREE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No.  3:11-CV-3538-M (BH) |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed July 5, 2012 (doc. 19), and *Defendant's Motion for Summary Judgment*, filed August 6, 2012 (doc. 20).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **GRANTED**, Defendant's motion should be **DENIED**, and the case should be **REMANDED** to the Commissioner for further proceedings.

**I.  BACKGROUND**[1]

**A.**    **Procedural History**

George L. Pree (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (R. at 1–6.)  Plaintiff applied for SSI on September 16, 2009,

---

[1]   The background information comes from the transcript of the administrative proceedings, which is designated as "R."

alleging disability beginning September 14, 2009, due to cirrhosis, HIV, hepatitis B and C, and major depressive disorder.  (R. at 150.)  His claim was denied initially and upon reconsideration.  (R. at 69–74, 80–83.)  He timely requested a hearing before an Administrative Law Judge (ALJ).  (R. at 84.)  He personally appeared and testified at a hearing on January 14, 2011.  (R. at 21–64.)  On May 10, 2011, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 10–16.)  On October 21, 2011, the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1–6.)  He appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).  (doc. 1.)

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born on November 30, 1959; he was 51 years old at the time of the hearing.  (R. at 25, 158.)  He earned a General Equivalency Diploma (GED) in 1986, (R. at 26, 156), and has no past relevant work, (R. at 56–57).

**2.    Medical Evidence[2]**

On July 25, 2006, Plaintiff presented to a Department of Health and Human Services Clinic (DHHS Clinic) for an initial consultation.  (R. at 307.)  He told clinic staff he had been released from prison five days earlier.  (*Id.*)  He took medications for his prostate, and he had been diagnosed with Human Immunodeficiency Virus (HIV) in 1996 but was not receiving treatment for it. (*Id.*)  He was not working and had no income.  (*Id.*)  He denied using drugs or alcohol or having any mental health history.  (*Id.*)  Plaintiff returned to the DHHS Clinic on February 24, 2007, to request a different

---

[2]  Although the record also contains psychiatric and psychological evidence, only the medical evidence is included in this summary because this action is ultimately resolved based on Plaintiff's physical impairments.

sleep medication because his current medication was no longer effective.  (R. at 220.)  He reported

depression, mood swings, crying spells, "attitude problems," and a poor appetite.  (*Id.*)

On May 31, 2007, Plaintiff saw Mary Monastesse, M.D., his primary care provider at

Parkland's Amelia Court Clinic for Infectious Diseases (Amelia Court).  (R. at 309–310.)  He

complained of lower chest pain that intensified when he lifted heavy objects.  (R. at 310.)  He

presented to Parkland Hospital (Parkland) on August 14, 2007, due to ongoing cough and chest pain.

(R. at 302.)  An examination revealed "pharyngeal inflammation."  (R. at 303.)  X-rays of his chest

showed signs of "old granulomatous disease."  (R. at 306.)  The diagnoses were acute sinusitis,

benign hypertrophy of the prostate, and asymptomatic HIV infection.  (R. at 304.)  Later that day,

he also saw Dr. Woo, his treating physician at the DHHS Clinic, and reported cold-like symptoms

lasting for two or three weeks, chills, joint pain that he rated five on a ten-point scale, decreased

appetite, and weight loss.  (*Id.*)  Dr. Woo prescribed him medication.  (*Id.*)

Plaintiff returned to Amelia Court in September 2007, because he had diarrhea lasting for

"many months" and pain in his right thigh from a pinched nerve.  (R. at 218.)  He told Dr.

Monastesse he was exposed to, and treated for, tuberculosis[3] in 1987 while in prison.  (*Id.*)  His viral

load[4] that day was "undetectable."  (*Id.*)  Dr. Monastesse prescribed him medication for his

symptoms.  (*Id.*)  Liver function tests conducted the following month showed "no evidence of

---

[3]  Tuberculosis is a "disease caused by infection with *Mycobacterium tuberculosis*, the tubercle bacillus, which can affect almost any tissue or organ of the body, the most common site of the disease being the lungs." *Stedman's Medical Dictionary* 2046 (28th ed. Lippincott Williams & Wilkins, 2006).  "The symptoms of active pulmonary [tuberculosis] are fatigue, anorexia, weight loss, low-grade fever, night sweats, chronic cough, and hemoptysis." *Id.*  The risk of activation of the disease "is increased by diabetes mellitus, malnutrition, HIV infection, ... [and] in patients with alcoholism." *Id.*

[4]  HIV viral load is "a standard procedure to monitor the course of AIDS.  Reported as the number of copies of viral RNA per mL of plasma, assessment of viral load provides important information about the number of lymphoid cells actively infected with HIV." *Id.* at 1113.

dysplasia, malignancy, granulomatous disease, or other viral cytopathic change in the liver." (R. at 267.)

Plaintiff saw Dr. Monastesse on January 7, 2008. (R. at 221, 231.) He complained of depression, worsening back pain, hemorrhoids, erectile dysfunction, chronic cough, constant chest and abdominal pain, and pain in his right leg from a pinched nerve. (R. at 231.) Dr. Monastesse prescribed him medication and referred him to a gastroenterologist regarding his abdominal pain. (R. at 232–33.) On January 24, 2008, he was treated at Parkland for cold symptoms, including nasal drainage, sore throat, cough, and night sweats. (R. at 244.)

Plaintiff was admitted to Parkland on March 11, 2008, because of ongoing fever, chills, cough, and sputum production. (R. at 239, 291.) X-rays of his chest revealed calcified mediastinal lymph nodes and calcified granuloma in his left upper lung, but there was "no evidence of pulmonary infiltrate or pleural effusion." (R. at 239.) The diagnoses were acute prostatitis, epididymitis, acute bronchitis, history of HIV infection, and history of hepatitis C infection. (R. at 391.) When he was discharged two days later, his cough and sputum production had improved. (R. at 392.)

On May 15, 2008, police officers took Plaintiff to Parkland's emergency room for a suspected cocaine overdose. (R. at 237.) They told hospital staff they arrested him that day and confiscated a bag of cocaine and two empty bags that may have also contained the substance. (*Id.*) He was in no acute distress during a physical examination and was released that day. (R. at 238.) Three months later, Plaintiff visited Dr. Monastesse for a routine check up on his HIV infection. (R. at 227.) This time his viral load was detectable at 245. (*Id.*)

On January 8, 2009, Plaintiff underwent a "max electrocardiogram exercise test" at the

direction of Dr. Monastesse.  (R. at 214.)  The test was terminated after only nine minutes due to chest pain and "general fatigue;" it revealed "no ST changes" that would indicate myocardial ischemia.  (*Id.*)  He followed up with Dr. Monastesse the following week and told her he had chest pain and shortness of breath almost every day.  (R. at 215, 217.)  His pain was moderate in severity and lasted several "seconds" at a time.  (*Id.*)

During another routine check up on June 23, 2009, Plaintiff told Dr. Monastesse he experienced shortness of breath, cough, and nausea for the past two weeks.  (R. at 485.)  He had no fever or night sweats.  (R. at 486.)  His viral load count was undetectable.  (*Id.*)  Six days later, Plaintiff presented to Parkland complaining of fever lasting a week, cough, fatigue, chest pain, and shortness of breath.  (R. at 491.)  He also reported a 25-pound weight loss and decreased appetite.  (R. at 495.)  It was noted he smoked and "abuse[d]" alcohol.  (*Id.*)  He was alert, cooperative, and in no apparent distress.  (R. at 493, 497.)

On August 4, 2009, Plaintiff returned to Parkland because of swelling and discomfort in his lower abdomen for the prior three weeks.  (R. at 209, 211.)  He told hospital staff he had gone to the emergency room a few days earlier, but the medication he was prescribed did not alleviate his symptoms.  (R. at 209.)  He had a "poor appetite" and continued feeling pressure in his chest.  (*Id.*)  The doctor gave him a prescription for "ascites."[5]  (R. at 210.)  An ultrasound of his abdomen taken days later showed signs of "splenomegaly", but no ascites.  (R. at 359.)  His liver appeared normal in size, his gallbladder was "unremarkable", and there was "no evidence of cholelithiasis" or "focal tenderness over [his] gallbladder."  (R. at 359, 361.)  X-rays of his chest showed "no significant interval change" from X-rays taken in January 2009 and July 2009.  (R. at 363.)  A Computed

---

[5]  Ascites is an "[a]ccumulation of serous fluid in the peritoneal cavity."  *Id.* at 165.

Tomography (CT) scan revealed findings "suggestive of cirrhosis"[6] but no evidence of "acute pulmonary disease." (R. at 364.)

On August 5, 2009, Plaintiff presented to the Methodist Health System Hospital Emergency Room (Methodist ER) complaining of abdominal pain lasting three weeks. (R. at 584.) Robert Hancock, M.D., diagnosed him with ascites and cirrhosis, prescribed him medication, and released him with instructions to follow-up with his primary care provider. (R. at 585.)

Plaintiff was admitted to Parkland on August 10, 2009, due to fever, night sweats, and severe abdominal pain. (R. at 381–82.) An ultrasound of his abdomen revealed no ascites, splanchnic vessel thromboses, or cirrhosis. (R. at 382.) It showed fatty liver infiltrations[7] and a mild enlargement of his spleen. (*Id.*) He had elevated liver function tests, increased alpha-fetoprotein (AFP) levels, and a "high viral load." (R. at 869, 899.) Kevin Davidson, M.D., the examining physician, opined that the fatty liver infiltrations and spleen enlargement "indicated spherocytosis." (*Id.*) He "counseled [Plaintiff] at length about the importance of avoiding alcohol, tobacco, and drugs." (R. at 382.) Plaintiff's liver was "in particular peril given his hepatitis C, fatty infiltration, and profound alcohol history." (*Id.*) Dr. Davidson opined that Plaintiff was not a candidate for hepatitis C treatment because he was "actively" using drugs. (R. at 899.)

The next day, Plaintiff told Dr. Davidson that his abdomen was increasing in size, he had recently gained 20 pounds, and he constantly experienced shortness of breath and increasing chest pain. (R. at 373.) He also had headaches, backache, difficulty walking, and drowsiness. (*Id.*) He

---

[6] Cirrhosis is "[a] chronic liver disease of highly various etiology characterized by inflammation, degeneration, and regeneration in differing proportions; ... impairment of hepatocellular function and obstruction to portal circulation often lead to jaundice, ascites, and hepatic failure." *Id.* at 383–84.

[7] Fatty liver is a condition "in which the liver is enlarged by fatty change, with mild fibrosis." *Id.* at 384.

told Dr. Davidson he used drugs, "shooting and snorting cocaine as recently as one month [before] along with marijuana." (*Id.*)  Although he used to drink heavily, he claimed to have stopped drinking in February 2009.  (*Id.*)  He had smoked for 38 years, up to one pack per day, but he currently only smoked one or two cigarettes per day. (*Id.*) Dr. Davidson's "[d]ifferential diagnosis" consisted of transudative ascites secondary to cirrhosis from hepatitis C, portal vein thrombosis, budd-chiari syndrome, splenic vein thrombosis, right-sided congestive heart failure, peritoneal carcinomatosis, peritonitis, and tuberculosis.  (R. at 374.)  Dr. Davidson ordered an ultrasound of Plaintiff's liver and performed "paracentesis" in an (unsuccessful) attempt to remove "ascitic fluid" from his abdomen.  (R. at 375.)

Dr. Monastesse treated Plaintiff on October 30, 2009, for a cough lasting several weeks.  (R. at 383.)  Plaintiff stated he had stopped using cocaine the week before, but he continued smoking marijuana regularly.  (R. at 384.)  Dr. Monastesse refilled his prescriptions, ordered X-rays of his chest, and advised him to "stop smoking." (R. at 385–86.)  Plaintiff had elevated liver function tests and increased AFP levels in his liver.  (R. at 498.)

X-rays of Plaintiff's lumbar spine taken on February 19, 2010, revealed spurring at the L4 and L5 levels, a normal alignment, and "no fracture or loss of disc height." (R. at 406.)  During an HIV check up at Amelia Court the following month, Plaintiff reported coughing, sneezing, and wheezing, but no fever or sputum production.  (R. at 411–12.)  Noting that his "CD4" count was declining and he had a persistently low viral load count, Shona A. Lee, M.D., the attending physician, determined he was "ready" to begin treatment for his HIV infection.  (R. at 412–13.) Dr. Lee explained Plaintiff's treatment options to him and scheduled a consultation with a counselor in efforts to ensure his adherence to the treatment program given his "drug use and past history" of

-7-

non-compliance.  (R. at 414.)  She also cautioned him to "stay away from all alcoholic drinks and Tylenol."  (*Id.*)  He returned to Amelia Court on May 18, 2010, and reported numbness in his right thigh for the past five weeks.  (R. at 891.)  He requested a cane, stating he had fallen at least five times since the numbness in his leg began.  (*Id.*)  A physical examination was "essentially normal except for slightly decreased [range of motion] of [his] back."  (R. at 892.)

On June 17, 2010, Scott Spoor, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's medical records and completed a physical Residual Functional Capacity (RFC) Assessment.  (R. at 465–72.)  His "primary diagnosis" was HIV infection and his secondary diagnosis was "steatohepatitis."  (R. at 465.)  Dr. Spoor determined that Plaintiff had the following RFC: lift and carry 10 pounds frequently and 20 occasionally; stand, walk, and sit for six hours in an eight-hour workday; push and pull an unlimited amount of weight; and no postural, manipulative, visual, communicative, or environmental limitations.  (R. at 466–69.)  Dr. Spoor referenced Plaintiff's visit to Methodist ER in August 2009 when he reported a 20-pound weight gain in one month and "abdominal distention," and he noted Dr. Hancock's opinion that Plaintiff "was suspected to have new onset ascites."  (R. at 472, 584.)  He referenced Dr. Davidson's August 10, 2009 findings that Plaintiff had cirrhosis and fatty liver infiltrates as well as "moderately-active hepatitis C."  (R. at 381, 472.)  Lastly, Dr. Spoor acknowledged Plaintiff's exposure and treatment for tuberculosis while in prison, but noted that "he was never infected" with the disease.  (R. at 472.)  He concluded that Plaintiff's allegations about the severity of his symptoms were only "partially supported" by the evidence of record. (R. at 470.)

On June 18, 2010, Plaintiff presented to Parkland's Urology Clinic for a consultation regarding his benign prostatic hypertrophy.  (R. at 482–83, 787–95.)  Jennifer M. Wimberly, M.D.,

the urologist, noted that Plaintiff had been treated for his HIV infection for the past several months. (R. at 482.) Plaintiff told Dr. Wimberly he had urinary symptoms for many years, but these had worsened over time, and his current medication gave him little relief. (R. at 788.) Dr. Wimberly increased his medication dosage and ordered laboratory tests. (R. at 483.)

During a routine check up at Amelia Court the following week, Plaintiff told Dr. Monastesse that he was taking his HIV medications as prescribed, but his constant cough caused him to vomit them. (R. at 485.) His other symptoms were shortness of breath, nausea, difficulty breathing, daily asthma attacks, and fatigue. (R. at 485, 489.) Dr. Monastesse found his lungs were clear to auscultation. (*Id.*) X-rays of his chest showed "no active pulmonary process." (R. at 808.) His viral load that day was "undetectable." (R. at 488.) When he returned three days later complaining of the same symptoms, Michael Hopkins-Sea, M.D., diagnosed him with "chronic bronchitis" and prescribed him an antibiotic. (R. at 828.)

By July 26, 2010, Plaintiff continued to experience night sweats. (R. at 501.) Rasha Marwan Ghurani, M.D., a physician at Amelia Court, consulted with Plaintiff regarding "evaluation and management of [his] HIV infection." (R. at 854.) He told Dr. Ghurani he had lost 25 pounds and had a decreased appetite. (*Id.*) He admitted using intravenous drugs, smoking, and having abused alcohol in the past. (*Id.*) Dr. Ghurani continued his medications and ordered a "[s]creening for colon cancer." (R. at 858.) Plaintiff tested positive for cocaine in a toxicology exam. (R. at 861.)

Multiple laboratory tests were conducted between June and August 2010 relating to Plaintiff's weight loss and recurring night sweats. (*See* R. at 509–61.) When he returned to Amelia Court for an HIV "acute visit" on August 23, 2010, he told Dr. Monastesse he had back pain "with a lot of spasms" and numbness in his right thigh. (R. at 890–903.) X-rays of his back taken on

August 29, 2010, showed no significant disc herniation or spinal canal stenosis.  (R. at 899.)  On September 7, 2010, Dr. Ghurani observed that Plaintiff's retroperitoneal lymph nodes in his abdominal cavity were "not abnormal in size, but [were] greater in number than [were] usually seen."  (*Id.*)  She prescribed him flexiril to relieve the cramping in his lower back and ordered a CT scan of his abdomen and pelvis.  (*Id.*)

Plaintiff was again admitted to Parkland on September 13, 2010, due to fever, night sweats, pelvic pain, and cough.  (R. at 710.)  A purified protein derivative (PPD) test was positive for tuberculosis.  (*Id.*)  Plaintiff tested positive for cocaine in a toxicology analysis.  (*Id.*)  A CT scan of his abdomen revealed "[m]ultiple nonenlarged and slightly enlarged lymph nodes."  (R. at 727.) Kumar S. Desai, M.D., the examining physician, opined that the "[c]onfiguration of [Plaintiff's] liver suggest[ed] cirrhosis."  (*Id.*)  She diagnosed him with lymphadenopathy[8] and fever of unknown origin.  (R. at 727, 729.)  Dr. Desai determined that given Plaintiff's "classic B symptoms," i.e., fever, weight loss, and night sweats, his previous exposure to tuberculosis, and his low immune cell count, his condition was "more likely" to be "miliary [tuberculosis] than some other opportunistic infection."  (R. at 732–33.)[9]  However, because his cough was "non-productive," "there [was] less concern for active pulmonary [tuberculosis]."  (R. at 733, 740.)  Dr. Desai prescribed him "albuterol and ipratroprium nebulizer treatments" for his respiratory symptoms.  (R. at 710.)  He was discharged in a stable condition four days later.  (*Id.*)

On September 23, 2010, Yvonne Post, D.O., another SAMC, reviewed Plaintiff's medical

---

[8]  Lymphadenopathy is a "disease process affecting a lymph node or lymph nodes" as well as "[t]he appearance of enlarged lymph nodes found on a radiological examination."  *Id.* at 1126.

[9]  Miliary tuberculosis "results in widespread dissemination of tubercles throughout the body"; lesions called "granulomas" develop in tissues such as "lymph nodes, bowel, kidney, [and] skin."  *Id.* at 2046.

records and completed a physical RFC Assessment.  (R. at 576–83.)  Dr. Post opined Plaintiff's

primary diagnosis was his HIV infection and his secondary diagnosis was his hepatitis C.  (R. at

576.)  She determined Plaintiff had the following RFC: lift and carry 20 pounds occasionally and

10 pounds frequently; stand, walk, and sit for six hours in an eight-hour workday; push and pull an

unlimited amount of weight; and no manipulative, visual, communicative, or environmental

limitations.  (R. at 577–81.)  In reaching these findings, Dr. Post noted Plaintiff's statement to Dr.

Wimberly in June 2010 that he was taking his HIV medications as directed.  (R. at 581.)  She

referenced  Amelia  Court  treatment  notes  from  May  2010  stating  that  Plaintiff  engaged  in

intravenous drug use, smoking, and alcohol abuse.  (*Id.*)  She also remarked about Plaintiff's

exposure and treatment for tuberculosis while he was in prison but noted that he "was never

infected." (*Id.*)  She referenced Dr. Davidson's opinion from August 10, 2009, that Plaintiff had no

ascites but did show signs of cirrhosis and fatty liver infiltrate and had moderately active hepatitis

C.  (R. at 382, 581.)  Dr. Post concluded that Plaintiff's allegations about the severity of his physical

limitations were only "partially credible based on the [evidence of record]."  (R. at 581.)

Plaintiff was again admitted to Parkland on October 7, 2010, for complications of his HIV

infection.  (R. at 694.)  A biopsy of his "left retroperitoneal lymph nodes" "demonstrate[d]

retroperitoneal  lymphadenopathy."   (R.  at  629–30.)   A  CT  scan  of  his  abdomen  showed  his

retroperitoneal lymph nodes had "generally increased in size and number" since the last CT scan was

conducted the previous month.  (R. at 632.)  Sheldon L. Blend, M.D., opined that the "relatively

rapid increase" in the size and number of Plaintiff's lymph nodes "suggest[ed] an acute active

process in addition to [his] HIV infection" such as "lymphoma, metastic disease, or ... tuberculosis."

(*Id.*)  He found that the left lobe of Plaintiff's liver was "relatively increased in size" compared to

the right lobe and opined that this condition was "associated with splenomegaly" and "suggest[ed] early cirrhosis."  (*Id.*)  Plaintiff tested positive for cocaine in a toxicology analysis.  (R. at 652.)  He was discharged in a stable condition on October 9, 2010.  (R. at 696.)

On October 14, 2010, Plaintiff was admitted to Parkland.  (R. at 625, 641.)  Rebecca Rojas, M.D., initially diagnosed him with mycobacterial infection, which she "presumed" to be disseminated tuberculosis given his past exposure to the disease and his "rapidly progressing lymph node enlargement."  (R. at 625, 641.)  A bone marrow biopsy showed the "presence of storage iron," which  Dr. Rojas opined was "likely anemia of chronic disease" but not "iron deficiency anemia." (R. at 642, 689.)  She determined that "[n]o treatment" for this condition was needed at that time. (R. at 689.)  A CT scan of Plaintiff's chest demonstrated "[i]nnumerable 1 [millimeter] pulmonary nodules" that had "developed since the previous study," as well as "pericardiophrenic nodes" and nodes close to the vena cava and esophagus that had "enlarged since the previous examination."  (R. at 625.)  Based on these findings, "[m]iliary tuberculosis top[ped] the differential diagnosis."  (*Id.*) Dr. Rojas's final diagnoses were gastroesophageal reflux disease (GERD) and  "disseminated [tuberculosis] infection."  (R. at 637, 689.)  Dr. Rojas placed Plaintiff "on RIPE[10] therapy with pyridoxine" and opined that he would "need treatment for 9 months."  (R. 641, 643, 689.)  X-rays of Plaintiff's chest taken while Plaintiff remained hospitalized showed his lungs were clear and there was "no evidence of pleural disease."  (R. at 623.)  Dr. Rojas discharged him in a "stable condition" on October 20, 2012.  (R. at 644.)

Between October 22, 2010 and January 5, 2011, Plaintiff underwent RIPE therapy for his

[10] RIPE consists of four different types of medications used to treat tuberculosis and mycobacterial infections consisting of: Rifampin, Rifabutin, or Rifapentine; Isoniazid; Pyrazynamie; and Ethambutol.  *Attorney's Textbook of Medicine* 34-50–34-51 (3d Ed. LexisNexis, 2010).

tuberculosis infection at the direction of Dr. Woo at the DHHS Clinic. (*See* R. at 586–610.) Staff from the DHHS Clinic brought Plaintiff's medication to his home during the week. (*See id.*) He took three medications per day and initialed for every dose he was administered. (*See* R. at 586, 601–605.) He often reported fever, chills, cough, night sweats, and weight loss during consultations. (*See* R. at 586, 588, 591–92, 595–96.)

On November 8, 2010, Plaintiff presented to Amelia Court to request medication refills. (R. at 946–51.) He reported "doing much better" since being discharged from the hospital, "[h]is fevers [were] resolved," and "his cough [was] almost gone." (R. at 951.) He told Dr. Monastesse he was compliant with his medications. (*Id.*) Plaintiff tested positive for marijuana in a drug analysis test. (R. at 962.) The following week, he complained of an "itchy rash", which Dr. Ghurani opined was a side-effect of his tuberculosis treatment. (R. at 968.) Dr. Ghurani administered a benadryl injection and prescribed him atarax for his rash. (R. at 974.)

### 3.    Hearing Testimony

On January 14, 2011, Plaintiff, his mother, and a vocational expert testified at the hearing before the ALJ. (R. at 21–64.) Plaintiff was represented by an attorney. (R. at 23.)

### a.    *Plaintiff's Testimony*

Plaintiff testified that he was 51 years old, lived with his mother and step-father, and had a 12th grade education. (R. at 24–25.) He was not married and had an 18-year old son. (R. at 26.) He was six feet tall and weighed 170 pounds, but this was not his normal weight since he had lost 30 pounds in the past six or seven months. (*Id.*) He went to prison from 1992 to 2007 for aggravated robbery. (R. at 27.) After his release, he worked at a poultry processing farm hanging chickens upside down on a conveyor belt to prepare them for slaughter. (*Id.*) He quit his job after

one week because it made him "sick", and he was hospitalized.  (R. at 27–28.)  Before that, he worked for a temporary agency called Resource Staffing driving a forklift.  (R. at 28, 57.)  He worked at Resource Staffing for only three months because he went back to prison to serve the remainder of his parole.  (R. at 28.)

Plaintiff testified that he could not work because he had pain and numbness in his right leg, and he "use[d] the restroom constantly" due to his diarrhea.  (R. at 29.)  He was dizzy almost every day, although "[s]ome days [were] better than others."  (*Id.*)  He could not stand for too long because of the pain in his right leg.  (R. at 29–30.)  He felt numbness, like a "cold feeling going down [his] body," from his right hip "all the way down to [his right] foot."  (R. at 30.)  In the past, he was able to exercise but now the doctors told him not to exercise because it aggravated his condition.  (*Id.*)  His doctor at Parkland had prescribed him a cane the previous year.  (R. at 29, 31.)  The doctor also prescribed him medication for his leg but could not determine the cause of his symptoms.  (R. at 31.)  The medication did not help. (R. at 32.)  He had recently fallen trying to step onto a curb because his right foot was numb.  If he sat for too long, the numbness in his leg would make him "uncomfortable", and he needed to "move around."  (R. at 58.)

Plaintiff went to Parkland to treat his HIV infection, prostrate condition, and cirrhosis.  (R. at 33.)  The doctors terminated his treatment for hepatitis C because it was affecting his immune system and "making [him] sick all the time."  (*Id.*)  He had been treating his HIV infection for about a year.  (*Id.*)  He took his medicine regularly, although his doctors changed it on occasion.  (R. at 35.)  Amelia Court gave him his medications free of charge.  (*Id.*)

Plaintiff had recently been hospitalized at Parkland because he was very sick, "coughing real bad, and losing weight with sweats, and [the doctors] didn't know what was wrong with [him]."  (R.

-14-

at 36.)   The doctors conducted X-rays, CT scans, and other examinations, but they could not determine what caused his symptoms.   (*Id.*)   They finally diagnosed him with tuberculosis in his stomach, and he also "tested positive for lupus."  (R. at 36–37.)  He saw Dr. Woo once a month to monitor his tuberculosis treatment.  (R. at 36–37.)  Staff from the Clinic brought him his medication every day, except for Saturday and Sunday.  (R. at 37.)  His tuberculosis was not contagious.  (*Id.*)

Plaintiff's tuberculosis symptoms worsened about eight or nine months before to the hearing. (R. at 38.)  His night sweats and constant vomiting caused him to lose about fifty pounds.  (*Id.*)  He began treating his tuberculosis in November 2010, and by the time of the hearing, his symptoms had improved.  (R. at 39–40.)  Although he did not have as many night sweats, he still had very little energy and constantly ran out of breath.  (*Id.*)

Plaintiff saw Dr. Noss, a psychiatrist, for his major depressive disorder.  (R. at 41.)  Although he was never told this, the medical reports stated he was bipolar because he experienced frequent mood swings.  (*Id.*)  He often heard voices, as if people were calling out his name, and he would go answer the door, but nobody was there.  (*Id.*)  He told Dr. Hershey, the consultative psychologist, that he attempted suicide three times.  (R. at 42.)  His last attempt was a year before the hearing. (*Id.*)  He had no suicidal thoughts at the time of the hearing because he prayed a lot to deal with those thoughts.  (*Id.*)  His long-term memory was good, but he could not remember "new" things. (*Id.*)  He would "forget something going from the kitchen to the bedroom."  (*Id.*)

Plaintiff's mother made him clean his room, but she did all the other household chores.  (*Id.*) He did not go grocery shopping because he disliked being around too many people at once— it reminded him of being in prison.  (R. at 43.)  He thought people were watching and talking about him.  (*Id.*)  Although he could sleep better when he took the Seroquel that Dr. Noss prescribed him

for his depression, he stopped taking it because Dr. Noss and him "had gotten into it about [Plaintiff's] mother." (R. at 46.)  Dr. Noss suggested that Plaintiff live on his own, but he wanted to "stay with [his] mama" because he felt "more comfortable" living with her.  (*Id.*)  His doctors recommended he continue seeing Dr. Noss, but he wanted to see another psychiatrist.  (R. at 47.)

Plaintiff saw a psychiatrist while he was in prison but was never prescribed any medications. (R. at 55.)  They told him he had an "anger problem" and enrolled him in an anger management program.  (*Id.*)  He did not complete the program, however, because he did not want to change.  (*Id.*) "[A] lot of things ... happened" in prison, and his "aggressiveness was [his] protection."  (*Id.*)

### b.     The Mother's Testimony

Plaintiff's mother also testified at the hearing.  (R. at 48–56.)  Plaintiff had lived with her since he was released from the penitentiary in 2006 or 2007.  (R. at 48.)  Because she did not work, she spent the whole day at home with Plaintiff.  (*Id.*)  Plaintiff slept and ate during the day.  (*Id.*) After eating, he would go to sleep or "run back and forth[] to the bathroom." (R. at 49.)  Sometimes his friend came to visit, and he and Plaintiff went to the park or would play cards.  (*Id.*)  After that, Plaintiff would go back to sleep.  (*Id.*)

Plaintiff's mother did all the grocery shopping.  (R. at 51.)  She asked him to clean his room, but "he [did not] want to keep his room clean."  (*Id.*)  She did not let him clean the house because she liked to "clean up [her] own house."  (*Id.*)  Plaintiff could get "very angry" at times, and she would "tell him [she was] going to hit him" to make him calm down.  (*Id.*)  He often had a "little attitude" and became "real hyper, ... just aggressive."  (R. at 52.)  On one occasion, Plaintiff was "accused of stealing a wallet", and he became very angry because it was not true.  (R. at 52–53.) She had to "call the police [on] him because he was acting up, and [she] didn't want [to] hit him."

-16-

(R. at 53.)  Plaintiff was taken to the hospital and kept overnight.  (*Id.*)

Plaintiff had lost a lot of weight recently.  (*Id.*)  She "tried to talk him into what he need[ed] to do, and to eat," and "he would eat, but it wouldn't stay with him."  (*Id.*)  He did not have enough energy to get out of bed in the morning and wanted to stay in bed all day.  (*Id.*)

### c.    *Vocational Expert's Testimony*

A vocational expert (VE) also testified at the hearing.  (R. at 56–62.)  The VE testified that Plaintiff had no history of significant gainful activity (SGA).  (R. at 56–57.)

The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age and education could work if he had a mental impairment that interfered with his ability to focus and his motivation and caused him to be off task 25% of the time at unanticipated times.  (R. at 57–58.)  The VE opined that the hypothetical person would not be able to work.  (R. at 58.)  The ALJ modified the hypothetical to include the following limitations: perform simple one-, two-, or three-step work that could be learned within 30 days; be able to interact with coworkers, supervisors, and the public; stand for four of eight hours; lift 20 pounds occasionally and 10 pounds frequently; and sit for six of eight hours.  (R. at 58–59.)  The ALJ asked the VE to opine whether this hypothetical person could "perform work at the light exertional level."  (R. at 59.)  The VE opined that the hypothetical person would not be able to perform light work.  (*Id.*)

The ALJ modified the hypothetical again to include the capacity to perform unskilled work at the light exertional level, but the person would miss work more than four times a month due to fevers, night sweats, and fatigue.  (R. at 60.)  The VE opined that the hypothetical person would not be able to perform work as it is performed in the national economy.  (*Id.*)  The ALJ changed the hypothetical to include the capacity to perform light work, but due to the person's overall medical

Case 3:11-cv-03538-M-BH   Document 23   Filed 08/09/13   Page 18 of 30   PageID 1121

condition and combination of impairments he would feel fatigued during the day and be able to

stand, walk, and sit for less than six of eight hours on a "bad day", which could be presumed to be

two days per week. (*Id.*) The VE opined that the hypothetical person would not be able to maintain

gainful employment. (*Id.*) The ALJ changed the hypothetical to include the following limitations:

stand, walk, and sit for six of eight hours; lift 20 pounds occasionally and 10 pounds frequently; and

no need for a cane. (*Id.*) The VE opined that the hypothetical person would be able to perform "the

full range" of light, unskilled, simple work, such as "advertising material distributor." (R. at 60–61.)

Counsel added the following limitation: because of mood swings and anger, the person

would be "significantly limited" in his ability to interact with supervisors, coworkers, and the public.

(R. at 62.) The VE opined that the hypothetical person would be restricted to employment that did

not deal with the public, which was generally repetitive and simple, short-cycle work. (*Id.*) This

limitation would "significantly restrict the number[] of jobs" the person could perform but would

not affect his ability to perform sedentary, light, unskilled work. (*Id.*) The VE added that if the

person was unable to receive and respond to instructions in a positive manner, he would be unable

to perform any SGA. (*Id.*)

## C.     **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion on May 10, 2011. (R.

at 10–16.) At step one, the ALJ found that Plaintiff had not engaged in SGA since September 16,

2009, the date of his application. (R. at 12.) At step two, the ALJ determined that Plaintiff had four

severe impairments: asymptomatic human immunodeficiency disease (HIV), hepatitis C, depression,

and schizoaffective disorder. (*Id.*) At step three, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the impairments

-18-

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the following physical and mental RFC: lift and carry 20 pounds occasionally and 10 pounds frequently; walk, sit, and stand for six hours in an eight-hour workday; understand, remember, and carry out simple tasks; make simple decisions; respond appropriately to changes in a routine work setting; and limited to no more than incidental contact with coworkers, supervisors, and the general public.  (R. at 13).

At step four, the ALJ found that Plaintiff had no past relevant work.  (R. at 15.)  At step five, based on the VE's testimony, the ALJ determined that based on Plaintiff's age, education, and RFC, Plaintiff could perform "a wide range of light unskilled work," including jobs that existed in significant numbers in the national economy.  (R. at 15–16.)  Accordingly, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act between his alleged onset date of September 14, 2009, and the date of the ALJ's decision.  (R. at 16.)

## II. ANALYSIS

A.    **Legal Standards**

1.       **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

> 1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found
         to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of
         the regulations will be considered disabled without consideration of
         vocational factors.

4.      If an individual is capable of performing the work he has done in the past,
         a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past
         work,
         other factors including age, education, past work experience, and residual
         functional capacity must be considered to determine if work can be
         performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R.

§ 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).   Under the first four steps

of the analysis, the burden lies with the claimant to prove disability.   *Leggett*, 67 F.3d at 564.   The

analysis terminates if the Commissioner determines at any point during the first four steps that the

claimant is disabled or is not disabled.   *Id*.   Once the claimant satisfies his or her burden under the

first four steps, the burden shifts to the Commissioner at step five to show there is other gainful

employment available in the national economy that the claimant is capable of performing.

*Greenspan*, 38 F.3d at 236.   This burden may be satisfied either by reference to the Medical-

Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.

*Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).   A finding that a claimant is not disabled at

any point in the five-step review is conclusive and terminates the analysis.   *Lovelace v. Bowen*, 813

F.2d 55, 58 (5th Cir. 1987).

**B.**      **Issues for Review**

Plaintiff presents the following issues for review:

(1)     Did the Commissioner consider all of the Plaintiff's severe impairments in determining [his] residual functional capacity? The Plaintiff maintains that the answer is "No."

(2)     Did the Commissioner apply the proper legal standard in this Circuit to evaluate severe impairments? The Plaintiff asserts that the answer is "No."; [and]

(3)     Having found that the Plaintiff does not have past relevant work, did the Commissioner carry [her] burden at step 5 of the sequential evaluation by establishing the existence of work, in significant numbers, which Plaintiff can perform? The Plaintiff argues that the answer is "No."

(Pl. Br. at 3.)

## C.     *Stone* **(De Minimis) Standard**[11]

Plaintiff contends the ALJ committed *Stone* error by "us[ing] an improper standard for the evaluation of a severe impairment."  (Pl. Br. at 5.)  He argues that the ALJ's *Stone* error was not harmless and requires remand because the ALJ failed to find that Plaintiff's recently diagnosed tuberculosis infection, cirrhosis, and anemia were severe impairments at step two, and this affected his physical RFC and therefore his ability to work at step five.  (*Id.* at 2–5, 7.)[12]

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c) (2012).  Finding that a literal application of this regulation would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the

---

[11]  Although Plaintiff lists this issue second, it is addressed first because the definition of "severity" used by the ALJ at step two directly impacts the disability analysis in the remaining steps.  *See Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000).

[12]  While Plaintiff separately lists the ALJ's alleged failure to find that his tuberculosis, cirrhosis, and anemia, were "severe impairments", this argument is analyzed together with the *Stone* issue because it relates to the inquiry of whether the *Stone* error was harmless.

individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id.* at 1104. To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to [*Stone*] or another [opinion] of the same effect, or by an express statement that the construction" the Court gave "to 20 C.F.R. § 404.1520(c) [was] used." *Id.* at 1106; *see also Loza*, 219 F.3d at 393. Notwithstanding this presumption, courts must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

Here, in reciting the applicable law, the ALJ stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (R. at 11) (citing 20 C.F.R. § 404.1520(c)). He then stated that "[a]n impairment or combination of impairments is 'not severe' when medical or other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (*Id.*) (citing Social Security Rulings (SSR) 85-28, 1985 WL 56856, at *3 (S.S.A. 1985)). The ALJ did not cite to or reference *Stone* in his decision. (*See* R. at 10–16.)

*Stone* provides no allowance for a *minimal*, and much less a *significant*, interference with a claimant's ability to work. The difference between the ALJ's statements and *Stone*, coupled with the ALJ's failure to specify which severity standard he actually used, compel the conclusion that he

applied an incorrect standard of severity.  *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the definition of severity under 20 C.F.R. § 404.1520(c) that the ALJ cited in this case); *see also Lawson v. Astrue*, No. 4:11-CV-00426, 2013 WL 449298, at *4 (E.D. Tex. Feb. 6, 2013) ("while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard").

As recently held by the Fifth Circuit and courts within this district, *Stone* error does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate in cases where the ALJ proceeds past step two in the sequential evaluation process.  *See Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* at step two but proceeded to steps four and five of the sequential evaluation process); *Goodman v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-1321-G BH, 2012 WL 4473136, at *9 (N.D. Tex. Sept. 10, 2012), *rec. adopted*, 2012 WL 4479253 (N.D. Tex. Sept. 28, 2012); *Jones v. Astrue*, 821 F. Supp. 2d 842, 851 (N.D. Tex. 2011).  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, at step two, the ALJ found that Plaintiff had four severe impairments: asymptomatic HIV, hepatitis C, depression, and schizoaffective disorder.  (R. at 12.)  Because none of Plaintiff's impairments or combination of impairments met or medically equaled a listed impairment at step three, the ALJ assessed Plaintiff's RFC.  (*See* R. at 14); *see also* 20 C.F.R. § 404.1520a(d)(3); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) ("If the [claimant's] impairment is severe, but does not

-24-

reach the level of a listed disorder, then the ALJ must conduct a [RFC] assessment.")  The ALJ determined that Plaintiff had the following physical RFC: lift and carry 20 pounds occasionally and 10 pounds frequently; and walk, sit, and stand for six hours in an eight hour workday.  (R. at 13.)

In assessing Plaintiff's RFC, the ALJ explained that he "considered all [of Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence."  (*Id.*)  The ALJ is required to consider all "medically determinable impairments ... including [those] that are not 'severe,'" as well as "all of the relevant medical and other evidence," when determining the claimant's RFC.  *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996) ("While a 'not severe' impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.").

The ALJ acknowledged Plaintiff's diagnoses of HIV and hepatitis C, and his "history of [tuberculosis] exposure while incarcerated."  (R. at 14.)  He noted Dr. Monastesse's June 23, 2010 treatment notes that Plaintiff was taking his HIV medications as prescribed, and his viral load that day was undetectable.  (R. at 14, 485–88.)  The ALJ also referenced Plaintiff's visit to Methodist ER on August 5, 2009, when he was seen for "acute abdominal pain and tenderness secondary to cirrhosis and ascites."  (R. at 14.)  He accepted Plaintiff's testimony that he was HIV positive and suffered from hepatitis C, arthritis, and cirrhosis.  (R. at 14, 33.)  However, the ALJ did not credit Plaintiff's testimony that he had "anger problems and [a] lack of energy to even get out of bed on a daily basis," finding no basis in the record for these allegations.  (R. at 15, 40, 55.)  He cited to Parkland treatment notes from September 14, 2010, that Plaintiff exhibited a non-productive cough

-25-

and had "lymph node enlargement." (R. at 14, 733.)  Twice in his opinion, the ALJ remarked that

Plaintiff was "never infected" with tuberculosis. (*See* R. at 14–15, 404, 618.)

The ALJ accorded "great weight" to the opinions of Dr. Spoor and Dr. Post, the SAMCs.

(R. at 15.)  His narrative discussion shows that he adopted their RFC findings. (*See* R. at 13,

466–69, 577–81).  The ALJ then proceeded to steps four and five, and with the VE's testimony, he

concluded that considering Plaintiff's age, education, and RFC, there were jobs existing in

significant numbers in the national economy that Plaintiff could perform, and he was therefore not

disabled. (R. at 15–16.)

Because the ALJ's narrative discussion shows that he considered Plaintiff's cirrhosis when

determining his RFC and therefore his capacity to work, the *Stone* error was harmless with respect

to this alleged impairment.  The ALJ did not consider or even address Plaintiff's alleged anemia.

On October 14, 2010, Dr. Rojas opined that the "presence of storage iron" in Plaintiff's bone

marrow indicated chronic anemia, but she ruled out iron deficiency anemia as "less likely" and

opined that no treatment for that condition was needed at that time. (R. at 689.)  To the extent that

the ALJ rejected Plaintiff's alleged anemia as not being a medically determinable impairment, as

the trier of fact, the ALJ was entitled to do so. *See* 42 U.S.C.A. § 423(d)(3) (West 2004) (providing

that a "physical" or "mental" impairment is "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques").

The ALJ's opinion did not discuss, or even address, Plaintiff's disseminated tuberculosis.

Plaintiff testified that he was diagnosed with tuberculosis in his stomach. (R. at 36.)  Although his

symptoms had improved with his medications, he still had occasional night sweats and very low

energy and constantly ran out of breath. (R. at 40.) On June 29, 2009, Plaintiff presented to Amelia

Court complaining of fever, cough, fatigue, chest pain, shortness of breath, and weight loss, which

are common symptoms of tuberculosis. *See Stedman's Medical Dictionary*, at 2046; (*see also* R.

at 491–97.) Between June 2009 and October 2010, Plaintiff saw multiple healthcare providers and

was hospitalized on various occasions due to these symptoms, in addition to night sweats. (*See* R.

at 244, 239, 291, 383–86, 411–12, 491, 710). In August 2009, Dr. Davidson included tuberculosis

in his "differential diagnosis." (R. at 374.) On September 13, 2010, three months after Dr. Spoor

completed his consultative RFC assessment and ten days before Dr. Post completed her RFC

assessment, Plaintiff tested positive for tuberculosis on a PPD test. (*See* R. at 710.) That same day,

Dr. Desai opined that Plaintiff's "classic B symptoms" were more indicative of miliary tuberculosis

than any other opportunistic infection. (R. at 732–33.) On October 7, 2010, Dr. Blend opined that

the "relatively rapid increase in the size and number" of Plaintiff's lymph nodes suggested "an acute

active process" such as tuberculosis. (R. at 632.) The following week, Dr. Rojas diagnosed Plaintiff

with disseminated tuberculosis and placed him on a nine-month RIPE regimen. (*See* R. at 625, 637,

641–43.) The opinions and diagnoses of these physicians were the result of "medically acceptable

clinical and laboratory diagnostic techniques" sufficient to establish Plaintiff's disseminated

tuberculosis as a physical impairment. *See* 42 U.S.C.A. § 423(d)(3); 20 C.F.R. §§ 404.1508,

416.908.[13]

---

[13]    Defendant argues that the ALJ's *Stone* error was harmless with respect to Plaintiff's tuberculosis
because Plaintiff was diagnosed in October 2010 and therefore "failed to show that his tuberculosis lasted the
requisite twelve months." (D. Br. at 5.) The Social Security Act does not require that a disabling impairment have
lasted 12 months by the time the disability determination is made, but rather, it requires that the impairment "last[] or
.. *be expected to last* for a continuous period of not less than twelve months ...." 42 U.S.C.A. §§ 423(d)(1)(A), 416(i)
(emphasis added); *see also Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986). Moreover, "just as a claimant's
disability onset date may precede the date of available clinical test results, so may the onset date of an impairment
precede its official diagnosis date." *Berset v. Astrue*, No. 5:11-CV-00194-BG, 2012 WL 3578597, at *6 (N.D. Tex.
July 30, 2012), *rec. adopted*, 2012 WL 3578603 (N.D. Tex. Aug. 20, 2012) (citing to *Ivy v. Sullivan*, 898 F.2d 1045,

Because the ALJ did not address Plaintiff's disseminated tuberculosis at any step of the disability analysis, it is unclear whether he purposefully dismissed it as non-severe based on his application of an incorrect severity standard at step two.  The ALJ did not consider the possible effects that this impairment may have had on Plaintiff's ability to perform physical work-related functions when assessing his RFC, as he was required to do by the regulations and the corresponding ruling.  *See* 20 C.F.R. § 404.1545(a)(1)-(3); SSR 96-8p, 1996 WL 374184, at *5.  Rather, the ALJ implicitly adopted Dr. Spoor's and Dr. Post's conclusions that Plaintiff was "never infected" with tuberculosis and their RFC assessments, including their findings that he had no environmental limitations.  (*See* R. at 15, 465–72, 577–81.) Consequently, the ALJ did not consider the effects that Plaintiff's disseminated tuberculosis may have had on his ability to work at step five.  It is not inconceivable that the ALJ would have imposed greater exertional limitations or some environmental limitations on Plaintiff's RFC, such as limiting his exposure to fumes, odors, dust, gases, or ventilation, if he had considered the effects of Plaintiff's disseminated tuberculosis on his ability to work.[14]  It is not inconceivable therefore, that the ALJ would have posed a more restricted

---

1048 (5th Cir. 1990)).  Accordingly, "[t]he critical date is the actual onset of the impairment, not the date of diagnosis." *Id.* (citing *Dunn–Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:10–CV–1826–BF, 2012 WL 987534, at *10 (N.D. Tex.  March 22, 2012)).  Here, the ALJ did not recognize Plaintiff's disseminated tuberculosis as an impairment and made no finding regarding its onset date.  Accordingly, it cannot be determined based on this record, whether Plaintiff's disseminated tuberculosis lasted or was expected to last 12 months after its onset date.

[14]  Defendant argues that Plaintiff has failed to show the ALJ's *Stone* error was not harmless and requires remand because Plaintiff "has not translated" his allegations regarding his tuberculosis "into work-related limitations."  (D. Br. at 5.)  "The ALJ is responsible for determining an applicant's residual functional capacity." *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); *see also* 20 C.F.R. § 404.1546(c). The ALJ may not determine the claimant's RFC "based solely on the evidence of his or her claimed medical conditions" but must obtain "opinions from medical experts."  *Williams v. Astrue*, 355 F. App'x 828, 832 (5th Cir. 2009) (citing *Ripley v. Chater*, 67 F.3d at 557).  It is the ALJ, and not the claimant, who determines the effects of the claimant's impairments on his ability to work based on expert medical opinion.  *See Ripley*, 67 F.3d at 557–58 (finding reversible error where "the only evidence regarding [the claimant's] ability to work came from [his] own testimony"; instructing the ALJ on remand to "obtain a report from a treating physician regarding the effects of [the claimant's] back condition upon his ability to work").

-28-

hypothetical to the VE and a different disability determination would have been reached. Accordingly, the ALJ's failure to ensure the *Stone* severity standard was used at step two was not harmless as to this impairment and requires remand.  *See Hall v. Astrue*, No. 3:11-CV-1929-BH, 2012 WL 4167637, at *13 (N.D. Tex. Sept. 20, 2012) (holding that *Stone* error was not harmless and required remand because the ALJ did not address or consider the effects of the claimant's chronic nasal congestion on his ability to work at any step of the sequential evaluation process).[15]

### III.   RECOMMENDATION

Plaintiff's motion should be **GRANTED**, Defendant's motion should be **DENIED**, and the case should be **REMANDED** to the Commissioner for further proceedings.

**SO RECOMMENDED**, on this 9th day of August, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[15]  Because the ALJ's use of the correct severity standard on remand will affect Plaintiff's remaining issues, these are not addressed.

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

-30-